**LIBERTY MUTUAL INSURANCE COM-
PANY, Appellant,**

v.

**Samuel T. POOL, Appellee.**

**No. 7964.**

Court of Civil Appeals of Texas.

Texarkana.

Nov. 25, 1969.

Rehearing Denied Dec. 16, 1969.

Victor Hlavinka, Atchley, Russell, Hutchinson & Waldrop, Texarkana, for appellant.

Cahill Hitt, Hitt & Cooksey, Texarkana, Alfred Welch, New Boston, for appellee.

FANNING, Justice.

Appellant insurance company has appealed from a total permanent disability judgment, 401 weeks at $35.00 per week, (less compensation paid and plus certain stated accrued medical expenses) rendered against it in a workmen's compensation case tried before the court with the aid of a jury.

In response to special issues 1 to 5, inclusive, the jury found to the effect: (1) Plaintiff Pool sustained an injury to his left leg below the knee on Oct. 6, 1967; (2) that such loss of use of said leg below the knee was total; (3) that the injury or the proper and necessary treatment of said injury was a producing cause of the total loss of use of plaintiff's left leg below the knee; (4) the beginning date of such total loss of the use of the left leg below the knee began on Oct. 6, 1967; (5) that such total loss of use was permanent.

In response to special issues 12 to 16, inclusive, the jury found to the effect: (12) that the injury or the proper and necessary treatment of the injury to plaintiff's left leg below the knee extended to and affected his left leg at or above the knee, thereby causing disability to his left leg at or above the knee; (13) that plaintiff sustained total loss of use of his left leg at or above the knee following the said injury; (14) that the injury or the proper and necessary treatment of said injury was a producing cause of such total loss of use of his left leg at or above the knee; (15)

that such total loss began Oct. 6, 1967; and (16) was permanent.

In response to special issues 25 to 29 the jury found to the effect; (25) that the injury or the proper and necessary treatment to plaintiff's left leg below the knee extended to and affected his buttocks, thereby causing disability to the buttocks; (26) that plaintiff sustained total disability following said injury; (27) that the injury or the proper and necessary treatment of said injury was a producing cause of such total disability, (28) which began on Oct. 6, 1967, and (29) was permanent.

In response to other special issues the jury found to the effect: (31) that plaintiff did not sustain partial incapacity, etc.; (38) that the incapacity to the plaintiff was not confined to his left leg below the knee; (39) that the incapacity to plaintiff was not caused solely by the loss of use of plaintiff's left leg below the knee; (40) that the incapacity to the plaintiff was not confined to his left leg at or above the knee; (41) that the incapacity to the plaintiff was not caused solely by the loss of use of plaintiff's left leg at or above the knee; (42) that the incapacity sustained by plaintiff to his buttocks was not solely caused by disease.

Also prior to submission of special issues to the jury, the parties stipulated as to attorney's fees and other matters, and also stipulated that the injury in question was confined to plaintiff's left leg below the knee and that the proper and necessary treatment of the injury was confined solely to plaintiff's left leg at or above the knee.

Under the jury's findings (and dependent upon which judgment was supported by evidence of probative force), the plaintiff was entitled to one of the following judgments (in addition to accrued medical expenses): (1) Compensation for total and permanent loss of use of the left leg below the knee, 125 weeks; or (2) compensation for total and permanent loss of use of the left leg above the knee, 200 weeks; or (3)

compensation for total and permanent disability, 401 weeks. As hereinbefore stated, the judgment of the court in favor of plaintiff was for total and permanent disability, less certain compensation paid plus certain stated accrued medical expenses.

Appellant does not question the right of appellee to a judgment for total and permanent loss of use of the left leg below the knee, referred to in (1) in the paragraph next above and seeks to confine plaintiff's recovery to that item, less compensation paid and certain stated accrued medical expenses.

Appellant, however, vigorously attacks the judgment for total and permanent disability and contends that there is *no evidence* to support the various jury findings upon which that judgment was based. Appellant also vigorously attacks the jury's findings with reference to issues relating to alleged total and permanent loss of use of plaintiff's left leg above the knee and contends that there is *no evidence* to support said findings.

We wish to specifically point out, however, that appellant does not present any *insufficient evidence* or *against the great weight and preponderance of the evidence* points with respect to the above questioned jury findings. Thus our examination of the *no evidence* points must be conducted under the rules of law with reference to *no evidence* points.

■ In considering the "no evidence" questions, we must consider only that evidence, if any, which viewed in its most favorable light, supports the jury's findings, and we must disregard all evidence which would lead to a contrary result. Biggers v. Continental Bus Systems, 157 Tex. 351, 303 S.W.2d 359 (1957); Cartwright v. Canode, 106 Tex. 502, 171 S.W. 696 (1914); Ford v. Panhandle & S. F. Ry. Co., 151 Tex. 538, 252 S.W.2d 561 (1952).

■ It is well settled law in Texas that in workmen's compensation cases where injury results to a particular member of the body, compensation, for the loss of which is specifically provided by statute, the liability of the insurer is limited to that amount, even though the loss of or injury to that particular member results in total permanent incapacity of the employee to labor. Consolidated Underwriters v. Langley, 141 Tex. 78, 170 S.W.2d 463 (1943); Travelers Insurance Company v. Marmolejo, Tex.Sup.Ct., 383 S.W.2d 380 (1964); Liberty Mutual Insurance Company v. Lee, Tex.Sup.Ct., 381 S.W.2d 172 (1964); Texas Employers' Insurance Association v. Espinosa, Tex.Sup.Ct., 367 S.W.2d 667 (1963); Texas Employers Ins. Ass'n. v. Brownlee, 152 Tex. 247, 256 S.W.2d 76 (1953); Argonaut Insurance Company v. Newman, Tex.Sup.Ct., 361 S.W.2d 871 (1962); Casualty Reciprocal Exchange v. Rodriguez, Tex.Civ.App., 415 S.W.2d 236, no writ, (1967); Petty v. Texas Employers' Insurance Association, Tex.Civ.App., 401 S.W.2d 678, wr. ref., n. r. e. (1966); Aetna Casualty and Surety Company v. Bryant, Tex.Civ.App., 383 S.W.2d 229, no writ (1964); Coleman v. Hartford Accident and Indemnity Company, Tex.Civ. App., writ refused, 297 S.W.2d 236 (1956).

■ If a workmen's compensation claimant contends for total disability benefits based upon an initial specific injury, there is an additional requirement that he show that his disability is caused by an extension of the specific injury. In this connection, see *Langley,* supra, and the other authorities cited above with *Langley.* However, it is also the law in Texas that where an employee sustains a specific compensable injury he is not limited to compensation allowed for that injury if proper or necessary treatment undertaken therefor brings about a disabling injury to another part of the body. In this connection, see Maryland Casualty Company v. Sosa, Tex.Civ.App., 425 S.W.2d 871 (1968), and authorities cited therein, affirmed per curiam, err. ref., n. r. e., Maryland Casualty Company v. Sosa, Tex.Sup., 432 S.W. 2d 515 (1968).

Unquestionably, under the medical and lay testimony plaintiff received a very severe explosion injury to his left foot and leg below the knee and there is ample proof to show that he is totally and permanently disabled. There is also proof to the effect that the treating doctor made surgical incisions into the left leg above the knee to stretch the posterior tibial nerve in plaintiff's left leg, all as hereinafter more specifically detailed.

Undoubtedly, plaintiff has a very meritorious claim for some workmen's compensation benefits. Without dispute, he is unquestionably in any event entitled to benefits for loss of use of the foot or left leg below the knee, 125 weeks. We think, however, that there is *no evidence* of probative force in the record to support the judgment for general injuries to the buttocks, for total and permanent disability, 401 weeks, for the reasons hereinafter more particularly outlined. While we consider it a very close question, we have reached the conclusion that as against the *no evidence* attack, that there is barely enough evidence of probative force to support a judgment for plaintiff for loss of use of the left leg above the knee, 200 weeks, less compensation paid, plus the certain stated accrued medical expenses stated in the judgment.

Plaintiff in the case at bar received, basically, a specific injury to the left foot. He contended that the medical treatment he received which consisted, among other things, of surgical incisions from the foot area up to and above his left knee, caused an extension of his injuries and disabilities therefrom, to the left leg above the knee and then to his buttocks. If he proved his contention that the injury and/or the medical treatment extended his injuries and disabilities to his buttocks he would have proven a general injury. If he failed in this proof he would be confined to a recovery for specific injuries, either to the left leg above the knee or to the left leg below the knee.

We think plaintiff failed to prove a general injury, to wit, injury to his buttocks. As we view the case there is no medical evidence of probative force to show an injury or extension of injury by medical treatment or otherwise to the buttocks. The lay testimony is also not legally sufficient to show a general injury or extension of an injury by medical treatment or otherwise to the buttocks.

The plaintiff's burden of proof to prove a general injury to the buttocks by reason of medical treatment or otherwise is not satisfied by the testimony of Dr. Green, the treating doctor, and the only doctor who testified in the case.

Plaintiff received a very severe blast injury to his left foot and the posterior tibial nerve was severed in the region of the fracture of the tibia. It was necessary and proper treatment that a resection of the nerve be made and a surgical incision was made on the back side of the left leg, beginning near the ankle and running up to a point about two inches above the knee. Said nerve had its root in the lower spine and extended down the entire length of the leg to the foot. There was a $3\frac{1}{2}$ to 4 inch gap made in the course of the nerve at the ankle, and it was necessary to make up this length by pulling down on the viable nerve tissue and bringing the nerve endings together. As we understand appellee's position, it is his view that in the process of pulling down, the involved nerve was stretched along its entire course at least into the region of the buttocks and that this stretching was harmful and damaging to the nerve tissue and particularly such harm and damage to the nerve extended to and damaged the buttocks, making and extending the injury by medical treatment into a general injury.

On the face of it, appellee's contention seems plausible. However, it is our view that an examination of the medical testimony will show that plaintiff's proof falls short of his theory. As we view the record, it is highly debatable and speculative

as to whether there is adequate proof that the nerve was stretched beyond a point well below the buttocks, but be this as it may, we think that there is no medical evidence that the stretching of the nerve, if it extended to the buttocks, was injurious, harmful or damaging to the plaintiff's buttocks, constituting a general injury. We are inclined to the view that Dr. Green's testimony (by deposition) not only does not establish any extension of injury to the buttocks by medical treatment or otherwise but rather instead tends to the contrary conclusion. We quote from the record various excerpts from Dr. Green's deposition testimony, as found below.[1]

I. (ON DIRECT EXAMINATION BY PLAINTIFF)

"Q. Now at this time and at this point, is the posterior tibial nerve in Mr. Pool's leg, at this particular point in time, shorter than it was before?

A. It is.

Q. Does it have to be stretched?

A. It will stretch out, it will be stretched primarily to straighten the leg.

Q. After you suture this and straighten the leg from the bent knee position, does this stretch the nerve?

A. It does.

Q. Does it stretch it all the way up and down its course?

A. There would be tension all the way up the course.

Q. All the way up to the back, where it comes from?

A. As long as it's not solidly fixed at some point, the tension would be exerted along the nerves above and below.

Q. Is it correct to say that you have to make up this shortening of the nerve by stretching it?

A. No. No. By freeing the nerve up, the shortening was made up. But to make up the shortening, you also have to bend the knee.

Q. All right.

A. And the knee can not be left in this position, so you gradually stretch it out after the nerve has healed, and then the nerve will gradually stretch and the nerve will be—will be fully free of stretch or strain.

Q. After this what did you do, this examination?

A. Well, the surgery for the nerve repair was on the 4th of March. And the 11th of March, he was placed in a long leg cast to hold the position. After surgery, he was placed in a paster splint again, due to the fact that a great deal of swelling usually occurs. After this subsides, they go into a circular plaster cast.

Q. Did you treat him after this hospitalization as an outpatient?

A. I did.

Q. And again, to cover time, would you review your notes during this treatment as an outpatient, between that time and the next hospitalization and see what of significance you find relative to this injury?

A. Okay. Now I want to enter in as error or as far as our progression is here, he was in the hospital on 19th of February through the 24th of February. And this time the nerve was explored, this was the first time it was explored. Okay, this is when the gap was found. And you asked me about x-rays. There was no x-rays taken on the March admission, but there were on the February admission.

Q. This is the time that the gap was brought back together?

A. No. The first time it was found— the extent of the gap was found and the position that he was in on the table was not suitable for extensive dissection necessary, so the nerve was sutured under tension. And that is what I was bringing up before, but I had to review this chart to bring this out. At any rate, the gap initially started out four inches, and then by dissection at this point we could narrow it down to two and a half inches. But it could not be closed, so the nerve was sutured at that site and the wound was closed. And he was brought back after this primary wound healed in March, to be placed on his stomach before he was placed on his back. And it was technically impossible to do it. February was the first admission, and March was the final admission.

Q. Let me summarize to make sure we are not getting lost. In February, you made a determination of the four inch gap, stretched it as far as you could?

A. Right.

Q. Because of the postition he was in on the table, you could not do anything further?

A. Right.

Q. You sewed it—him back up and brought him back in March for the long incision, and were able to bring it to-·gether?

A. Right. We brought him down from approximately two and a half inches from four. Then by gradually stretching the leg between the two admissions, the nerve was stretched enough that we—between

the two admissions, we could gradually get it together." S.F. p. 73–76

\* \* \* \* \*

"Q. At that point, where—what is the extent of his physical disability, where is he less than an average person?

"A. Well, he has loss of heel height, which requires him to wear a special shoe. His ankle is somewhat smaller because of the prolonged period of wearing the cast and as well as the blast injury to his lower extremity. This limits him in activity. He has swelling in some degree and pain in the lower ankle and he can not be on his foot for as prolonged a period of time as the normal individual." S.F. p. 89

\* \* \* \* \*

(ON CROSS-EXAMINATION BY DEFENDANT)

"A. (By Dr. Green)—What you can do then is to put a cast, wedge by leg out, and this will stretch the nerve because if you try to stretch it all at once, you will pull it in two or damage it above. And then this could be done several times, but we only had to expose the nerve twice. The second time, we were able to gain the amount of length necessary, without further dissection. But I was prepared to go all the way up to the buttocks to get the sciatic, but this was not necessary." S.F. p. 105, 106.

\* \* \* \* \*

"Q. What was the appearance above the place where you have trimmed it back?

A. It was normal.

Q. Was it normal to the calf?

A. The calf extended to the ankle.

Q. Say half way to the foot and knee?

A. Right. It was there above—three and a half inches above the ankle, it was normal." S.F. p. 106–107.

\* \* \* \* \*

"Q. I see. All right. Doctor, did you damage Mr. Pool's nerve in any way above that gap, in the treatment of it?

A. What do you mean by 'damage it'.

Q. Let me say this: did—was anything done to Mr. Pool's—this nerve in his leg above this gap, you know, the gap that was in it, in your treatment of it, that would impair the function of the nerve as far as giving sensation to the rest of the leg?

A. No. When you dissect, there are certain small branches above that can be sacrificed or actually sacrificed to gain length. There are many that go up there, you can tie them. This was not necessary here. The nerve freed up very well;

it was just a matter of getting it loose from its surroundings.

Q. Like getting it loose from pipe?

A. Right. And the branches are not freed in the tissue where they go into the muscle; they are just freed up to that point.

Q. So you didn't have to damage any of those above, the muscles above the knee?

A. No. Not in the calf, just dissect it from the normal tissue in the knee and dissect it above, and that was all that was necessary. If we had got to that point and still had to gain length, then a third possibility would have had to been done, and that would be a nerve graft. But that was not necessary." S.F. p. 107–108

\* \* \* \* \*

"Q. All right, sir. I am not sure how to put this question, Doctor. I am interested in knowing if in this stretching process that this nerve in Mr. Pool's leg —has the nerve suffered any further damage or anything?

A. None. Because if it did, he should develop, number one: when a nerve splits or actually the nerve is bound fairly well around the knee, then it splits into the peroneal nerve, which supplies the muscle, which cock the foot up. And they have been intact all along.

Q. Yes, sir.

A. And it also would affect the nerves that supply the hamstrings. And they function very well. This is not uncommon, to make up gaps of this length. Lengths of ten inches can be made up in other nerves. The thing is, stretch them slow enough not to tear it in two.

Q. Slowly enough?

A. Yes. And you are going to tear it at the suture line, and you are not going to tear it above." S.F. p. 112

\* \* \* \* \*

"Q. This nerve that you were talking about runs up the body, up the legs, and as I understand you said it connected into the spine, into the back?

A. The roots do, just like a tree; it has multiple roots coming out of the spine from the fourth lumbar vertebrae, they come out of the sacral, just like multiple wires coming out of a house, only this is in reserve. There has to be nerves to raise our legs up; because these nerves are stretched, they have to be elastic, because they are stretched every time you move an extremity.

Q. My question was, if these stretched nerves would cause pain?

A. If these \* \* \* how could \* \* \* I mean, he would be damaged by loss of function to the nerves, paralysis, and he has none.

As above stated, Dr. Green was the only medical witness, and as above stated, we think his testimony does not constitute any evidence of probative force to support a finding of general injury to the buttocks, by medical treatment or otherwise. In addition to the testimony of Dr. Green, plaintiff proffered his own testimony, and of witnesses Ray, Atkin, Taylor, James Pool and plaintiff's wife, Mrs. Samuel T. Pool.

The testimony of plaintiff and corroborated by his lay witnesses, we think establishes that plaintiff experiences pain up and down the back of his left leg, left thigh and that this pain runs up into the buttocks, hips and all the way into the back, and that the pain is of such a nature that plaintiff frequently complains of it and rubs his left leg and buttocks with his hand. The lay and medical testimony both establish that plaintiff can no longer do the work which his accustomed employment requires.

However, proof that pain which is the aftermath of an injury to a particular member is felt in another part of the body does not, in itself alone, authorize a recovery for something more than the original specific injury. Texas Employers' Insurance Ass'n. v. Espinosa, Tex.Sup.Ct., 367 S.W.2d 667 (1963).

We, therefore, hold that there is no evidence of probative force in the record to support a finding of general injury to plaintiff's buttocks by reason of medical treatment or otherwise.

As hereinbefore stated, in any and all events, plaintiff was undisputedly entitled to a judgment for total and permanent loss of use of the left foot, 125 weeks.

We are also of the further view that as against a *no evidence* attack, that there is barely enough evidence of probative force in the record to support a judgment for plaintiff for total and permanent loss of use of the left leg above the knee. Our reasoning is as follows: A surgical incision was made above the left knee; a very large and visible scar is shown by photographs of plaintiff's left leg. There is some medical testimony that the scar tissue is, as we view it, damaging to some extent. In this connection we quote from Dr. Green's testimony, in part as follows:

(ON RE-DIRECT BY PLAINTIFF)

"Q. The other pictures are pictures of Mr. Pool's leg?

A. Yes, sir.

Q. Looking at 15, 16 and 17, there is shown a scar extending from approximately the bottom of the foot to some point above the knee. Is this the incision that you had to make to connect this nerve?
Mr. Edwards: I will object to the question as leading on 'had to make.'

Q. Is this the incision that you made to connect the nerve?

A. Yes.

Q. I note on Exhibits Number 16 and 17, the incision is wavey or crooked. Why is this, Doctor?

A. Well, because you don't like to carry a straight line across a skin crease; this results in a scar that will limit the amount that you can stretch the leg out, because a bad scar can limit the amount.

Q. Is scar tissue stretchable?

A. Yes.

Q. And that did not happen?
A. No, sir * * *" S.F. p. 113

Q. So your treatment, this manner of treatment, should not injure his back and cause him back pain?
A. No. The only injury by pulling the nerves out would be if it was pulled apart at the suture site, and this did not.

Q. *Is it as stretchable as normal tissue?*

A. *No, not initially. It takes years for it to develop, but generally it is not.*

Q. *Is it more restrictive than normal tissue?*

A. *Yes.*

Q. I will introduce Exhibits 14 through 17.

MR. HITT: And ask the court reporter to mark Plaintiff's Exhibits 14, 15, 16 and 17." (Emphasis added.)

Also there is evidence from the plaintiff to the effect that he has pain in his left leg above the knee, as well as other portions of his body. In this connection, see the testimony of plaintiff in part as found below.[2]

Furthermore, as hereinbefore pointed out, there is ample proof that plaintiff is totally and permanently disabled from performing his accustomed tasks as a workman.

Although we realize the question is close, it is our best judgment, that as against the *no evidence* attack of appellant, that there

is evidence of probative force to support a judgment for plaintiff for compensation for total and permanent loss of use of his left leg above the knee, 200 weeks.

We sustain appellant's contention that appellee is not entitled to judgment for a general injury to his buttocks, and the judgment for 401 weeks' compensation is reversed.

We overrule appellant's contentions that appellee was not entitled to judgment for total and permanent loss of use of his left leg above the knee, 200 weeks.

Appellant's other points have been considered and are respectfully overruled.

The judgment of the trial court is reversed and the cause is remanded with instructions to the trial court to render judgment for plaintiff for 200 weeks compensation for total and permanent loss of use of his left leg above the knee, (with the stipulated portion authorized for attorney fee), together with the agreed accrued medical expenses, less the stipulated amount of compensation paid to appellee, with the proper interest, to be computed on past due installments of compensation, etc.

We also hold that under this record that it would be just and equitable to tax the

2. (ON DIRECT EXAMINATION BY PLAINTIFF)
"Q. All right, let me go back to this operation of March, 1968, when the doctor cut up into your leg. Have you noticed any difference in feeling in your leg since this operation?
A. Yes, sir.
Q. Describe to the jury what change you have noticed since the operation.
A. Well, I have pulling all up and down the back of the leg, here. I can straighten it out, but it hurts, so I try not to straighten it out no more than what I just have to.
Q. How high does this hurting up and down your leg go?
A. How high?
Q. Yes sir. I mean * * *
A. All the way up in my back.
Q. All right, let's start—where does it start from? Where does the hurting begin?
A. From my heel cord, here, at my ankle.

Q. All right, and it hurts all the way up to where?
A. To my hip.
Q. Does it hurt in your buttocks?
A. Yes, sir.
Q. Hurt in your hip?
A. Yes, sir.
Q. Does it hurt in your upper leg?
A. Yes, sir.
Q. Does it hurt in your lower leg?
A. Yes, sir.
Q. Now, Sam, this hurting that you have, this feeling that you have had ever since this operation, does it hurt just when you use the leg, or does it hurt at other times?
A. No, sir.
Q. When does it hurt? Tell the jury when it hurts.
A. Well, as I said a while ago, it is never completely easy. Even when I'm in the bed, it bothers me. At times I can't even sleep at night with it." S.F. p. 18–19

costs in this case, both in the trial court and in this court, as follows: one-half to be taxed against appellant, and one-half to be taxed against appellee.

Reversed and remanded with instructions and costs taxed in accordance with opinion.