

NUMBER 13-10-00554-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

COMMERCE & INDUSTRY INSURANCE COMPANY,      **Appellant,**

**v.**

KIMBERLY FERGUSON-STEWART, ET AL.,      **Appellees.**

### On appeal from the 163rd District Court
### of Orange County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Memorandum Opinion by Justice Garza**

When pain medication is prescribed for an employee's on-the-job injury, and that employee later dies from an overdose of that medicine, is the death compensable by worker's compensation? In this case, the trial court rendered judgment that such a death was compensable. Appellant Commerce & Industry Insurance Co. ("CIIC") argues by two issues that the trial court erred. We affirm.

## I. BACKGROUND

Bruce Mason Stewart was injured on May 25, 2004 while working for AltairStrickland, an industrial contracting firm. A bolt weighing several pounds fell from above, striking Stewart and injuring his shoulder and neck. Magnetic resonance imaging showed "minor disc bulges" at three levels on his cervical vertebrae. John Bergeron, M.D., Stewart's treating physician, diagnosed Stewart with a left shoulder contusion and prescribed hydrocodone, an analgesic, as part of Stewart's treatment plan. Dr. Bergeron instructed Stewart to take one pill containing 7.5 milligrams of hydrocodone every eight hours.

Stewart filed a claim with CIIC, his employer's worker's compensation carrier. CIIC initially denied the compensability of Stewart's claim. However, the Division of Worker's Compensation of the Texas Department of Insurance (the "Division")[1] overturned CIIC's decision. CIIC then sought judicial review of the Division's determination in the 133rd District Court of Harris County, Texas. *See* TEX. LAB. CODE ANN. § 410.251 (West 2006). The district court affirmed the Division's determination that Stewart's injury was compensable, and the First Court of Appeals affirmed the district court's judgment. *See Commerce & Indus. Ins. Co. v. Ferguson-Stewart*, 339 S.W.3d 744, 746–47 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (concluding in part that the trial court did not err by excluding evidence of Stewart's history of prescription drug use).

On October 3, 2004, while his worker's compensation claim was still being contested, Stewart died from an overdose of hydrocodone. A toxicology report showed that Stewart's blood contained a hydrocodone level of 0.38 mg/L, which is consistent

---

[1] Formerly known as the Texas Worker's Compensation Commission ("TWCC").

with acute severe toxicity.[2]   The toxicology report also showed that Stewart's blood contained carisoprodol, a prescription muscle relaxant, and marihuana.

Stewart's widow, appellee Kimberly Ferguson-Stewart, sought death benefits from CIIC through the Division.  However, the Division determined that Stewart failed to comply with Dr. Bergeron's instructions and that this failure resulted in Stewart's death.  Accordingly, the Division concluded that Stewart's death did not result from the compensable injury he sustained in 2004, and it ruled that Ferguson-Stewart was not entitled to death benefits.  *See* TEX. LAB. CODE ANN. § 401.011(31) (West Supp. 2010) ("An insurance carrier shall pay death benefits to the legal beneficiary if a compensable injury to the employee results in death.").  Ferguson-Stewart then petitioned for judicial review of the Division's determination in the 163th District Court of Orange County, Texas.[3]  *See id.* §§ 410.251, 410.301(a) (West 2006).  After a trial, a jury concluded that Stewart's death resulted from the treatment for his 2004 compensable injury, and therefore, Ferguson-Stewart was entitled to death benefits.  The trial court rendered judgment on the verdict and this appeal followed.[4]

## II. DISCUSSION

---

[2] At trial, Patricia Rosen, M.D., testified that "[Stewart]'s autopsy showed 10 times as much [hydrocodone] as what one would expect with therapeutic use."  Dr. Rosen also stated that "[i]f the patient was taking 7.5 milligrams [of hydrocodone] per pill, we know that the dose would have been approximately 20 of those pills.  So the amount ingested was much higher than what would be prescribed."

[3] Bruce Stewart's other beneficiaries—minor children Bruce Wayne Stewart, Crystal Leann Stewart and Daniel Scott Frasier—were named alongside Ferguson-Stewart as plaintiffs in the district court suit.  These parties, all of whom are appellees in the instant proceeding, will be referred to collectively as "Ferguson-Stewart."

[4] This case was transferred from the Ninth Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court.  *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005).

CIIC contends by its first issue that the evidence was legally and factually insufficient to show that Stewart's death resulted from medical treatment instituted to relieve the effects of his compensable injury. It argues by its second issue that Ferguson-Stewart is not entitled to recover death benefits under the Texas Worker's Compensation Act ("TWCA"). Because these issues are essentially identical, we will address them together.

## A. Standard of Review

In evaluating the legal sufficiency of the evidence supporting a verdict, we consider the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We will sustain a legal sufficiency challenge only if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence." *Jelinek v. Casas*, 328 S.W.3d 526, 532 (Tex. 2010) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

In reviewing factual sufficiency, we consider all the evidence in a neutral light and will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

We construe administrative rules, which have the same force as statutes, in the same manner as statutes, and we must ensure that the agency, here the Division, has interpreted its rules in harmony with its enabling statute. *See Rodriguez v. Serv. Lloyds Ins. Co.*, 997 S.W.2d 248, 254 (Tex. 1999); *Southern Ins. Co. v. Brewster*, 249 S.W.3d 6, 15 (Tex. App.—Houston [1st Dist.] 2007, pet. denied); *Cont'l Cas. Co. v. Rivera*, 124 S.W.3d 705, 710 (Tex. App.—Austin 2003, pet. denied). "[A]n agency's interpretation of a statute it is charged with enforcing is entitled to 'serious consideration,' so long as the construction is reasonable and does not conflict with the statute's language." *R.R. Comm'n of Tex. v. Tex. Citizens for a Safe Future & Clean Water*, 336 S.W.3d 619, 624 (Tex. 2011).

## B.    Applicable Law

The TWCA provides that, with certain exceptions not applicable here, an employee is entitled to compensation from his employer's worker's compensation insurance carrier, without regard to fault or negligence, if his injury arises out of and in the course and scope of employment. TEX. LAB. CODE ANN. § 406.031 (West 2006). Death benefits are payable to the legal beneficiaries of a deceased employee if a compensable injury results in the employee's death. *Id.* § 408.181(a) (West 2006). When death benefits are sought, a

> [c]ausal connection must be established between the injury and the death. The injury must be the producing cause of the death, and producing cause has been defined as that cause which, in a natural and continuous sequence, produces the death . . . in issue, and without which the death . . . would not have occurred.

*Transcont'l Ins. Co. v. Crump*, 330 S.W.3d 211, 222 (Tex. 2010) (citing *Jones v. Traders & Gen. Ins. Co.*, 140 Tex. 599, 169 S.W.2d 160, 162 (1943)).

In a 1993 opinion, the Division's appeal panel stated that the law does not "include, within the ambit of compensable injury, *every* consequence that might arguably not have occurred 'but for' the fact of an injury"; nevertheless, the law does support "compensation for a condition brought about by reasonable or necessary medical treatment for a work related injury." TWCC Appeal No. 93612, 1993 TX Wrk. Comp. LEXIS 3515, at *19 (Sep. 3, 1993) (emphasis added) (citing *Home Ins. Co. v. Gillum*, 680 S.W.2d 844 (Tex. App.—Corpus Christi 1984, writ ref'd n.r.e.); *Liberty Mut. Ins. Co. v. Pool*, 449 S.W.2d 121, 123 (Tex. Civ. App.—Texarkana 1969, writ ref'd n.r.e.)). In particular,

> [w]here disability or death results from medical treatment instituted to cure or relieve an employee from the effects of his injury, it is regarded as having been proximately caused by the injury and is compensable; such aggravation is regarded as a probable sequence and natural result likely to flow from the injury.

*W. Cas. & Sur. Co. v. Gonzales*, 506 S.W.2d 303, 309 (Tex. Civ. App.—Corpus Christi 1974), *aff'd*, 518 S.W.2d 524 (Tex. 1975). However, "damage or harm that results from the failure of a claimant to comply with doctor's instructions is not included within the scope of the original compensable injury." TWCC Appeal No. 050105-s, 2005 TX Wrk. Comp. LEXIS 50, at *8 (Mar. 8, 2005); TWCC Appeal No. 94257, 1994 TX Wrk. Comp. LEXIS 5675, at *6 (Apr. 18, 1994).

As the party challenging the determination of the Division's appeals panel, Ferguson-Stewart had the burden at trial to persuade the jury by a preponderance of the evidence that Stewart's death was the result of treatment for his compensable injury. TEX. LAB. CODE ANN. § 410.303 (West 2006); *see Transcont'l Ins. Co.*, 330 S.W.3d at 226 (quoting *Morales v. Liberty Mut. Ins. Co.*, 241 S.W.3d 514, 516 (Tex. 2007)) ("[T]he appealing party bears the burden of proof by a preponderance of the

evidence. The factfinder may consider, but is not bound by, the appeals panel's decision. The method of review that [the labor code] provides is known as modified de novo review.").[5]

**C.    Analysis**

The following facts were undisputed at trial: Stewart's original 2004 injury was compensable; Stewart's treating physician prescribed hydrocodone to relieve the pain caused by that injury; the prescription constituted "reasonable or necessary" medical treatment for that injury; and Stewart died from an overdose of hydrocodone. The only issue at trial and on appeal is whether Stewart's death resulted from this medical treatment.

The jury charge in this case instructed the jury that "[a] claimant's death does not result from medical treatment instituted to relieve the effects of his compensable injury if the death results solely from a claimant intentionally or knowingly failing to comply with his doctor's instructions."[6] The parties do not direct us to any judicial or administrative authority, and we find none, establishing either that (1) a failure to comply with doctor's instructions must be shown to be "intentional" or "knowing" in order to avoid

---

[5] In her appellate brief, Ferguson-Stewart characterizes CIIC's position as a "sole proximate cause defense," noting that: (1) CIIC is asserting that Stewart's death is not compensable because it was not the result of reasonable and necessary medical treatment, and (2) "injuries are compensable even if the workplace incident was merely one of several producing causes of the injury . . . ." Ferguson-Stewart proceeds to argue that, "[b]ecause of the statutory scheme and the implicit policy imperatives, when the carrier raises a sole proximate cause defense, it, and not the claimant, bears the burden of proof." Without determining whether Ferguson-Stewart's characterization of CIIC's appellate argument is accurate, we do not believe the legal proposition is supported by law. The TWCA clearly states that the party challenging the determination of the Division's appeals panel as to compensability bears the burden of proof when seeking judicial review. TEX. LAB. CODE ANN. § 410.303 (West 2006). In this context, that means Ferguson-Stewart bore the burden at trial to show, by a preponderance of the evidence, that the treatment prescribed by Dr. Bergeron caused Stewart's death. *See id.*

[6] The charge further stated that "[a] person acts 'intentionally' with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct" and that "[a] person acts 'knowingly' with respect to the nature of his conduct or to the circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist."

7

compensability, or (2) that such failure must be the "sole" producing cause of the claimant's death. *Cf.* TWCC Appeal No. 050105-s, 2005 TX Wrk. Comp. LEXIS 50, at *8 (stating only that "damage or harm that results from the failure of a claimant to comply with doctor's instructions is not included within the scope of the original compensable injury"); TWCC Appeal No. 94257, 1994 TX Wrk. Comp. LEXIS 5675, at *6 (same). Nevertheless, because neither party objected to the jury charge, we will assess the sufficiency of the evidence in light of the instruction as given. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."). Accordingly, the question presented by this appeal can be further narrowed to the following: was the evidence sufficient to support the jury's implicit finding that Stewart's death did *not* "result[] solely" from his "intentionally or knowingly failing to comply with his doctor's instructions"?

At trial, Ferguson-Stewart presented two theories as to how and why Stewart might have unintentionally or unknowingly ingested a lethal dose of hydrocodone. First, in what CIIC describes as the "accidental overdose" theory, Ferguson-Stewart alleged that the overdose must have been accidental because her husband did not intentionally or knowingly commit suicide. Tommy J. Brown, D.O., a forensic pathologist who performed an autopsy on Stewart, concluded that the cause of death was hydrocodone toxicity and that the manner of death was "accidental." When asked to expound on his conclusion as to the manner of death, Dr. Brown testified[7]:

> Well, I—I see it a lot. I do autopsies on people with chronic pain a lot and this—like before I see them, start out with their drugs and then they increase the drugs, and then to try the [sic] alleviate the pain more, and

---

[7] At trial, the doctor witnesses' expert testimony was given via videotaped depositions.

pretty soon they're taking more than prescribed, and pretty soon they will overdose theirselves [sic] or they will overdose theirselves [sic], some people do. And then they die and it's usually in a low lethal range [like that observed in Stewart]. So I consider that an accidental death because they were overdosing due to the chronic pain.

Ferguson-Stewart testified as follows:

Q. [Ferguson-Stewart's counsel]   Based on what you saw in your husband, what you saw going on, how sure are you [that it was an] accidental overdose?

A. [Ferguson-Stewart]   I'm positive it was accidental.

Q.   Because?

A.   Because he wouldn't have done that on purpose. He—I mean, he had every reason to want to live. He was just about to get custody of his oldest son, which he had fought for for years. And we—we were finally going to church like we were supposed to be doing and he was—his faith in God had gotten really strong and he had changed a lot.

Q.   Despite the denial and what y'all were going through as a family, did you ever see him just give up?

A.   Absolutely not. Even through the depression, he tried to fight the depression, just by making him[self] do things even though he didn't want to do it. Even though, you know, all he wanted to do was lay in bed and cry and just, you know, try to forget the whole thing, like try to pretend it never happened, he did everything he could to try to not let us see how bad he was hurting.

9

Stewart's mother, Susan Briggs, agreed with Ferguson-Stewart, testifying that her son's death was "definitely an accident. He had too many plans to be—he was—too full of too many plans [to have committed suicide]."

We find that the evidence relating to the "accidental overdose" theory was insufficient by itself to support the jury's finding. Dr. Brown concluded that the manner of Stewart's death was "accidental" but, when asked to elaborate on his conclusion, he stated that such an "accident" typically occurs when a patient "increase[s] the drugs" and "tak[es] more than prescribed" in order to "alleviate the pain more . . . ." In the scenario suggested by Dr. Brown, the patient does not intend to take his own life, but the patient *does* intend to take more drugs than are prescribed in order to better alleviate the pain—i.e., he intends to disobey his doctor's instructions—and death is an unintended consequence of that act. Dr. Brown's statement, along with the testimony of Ferguson-Stewart and Briggs, is evidence that Stewart did not intentionally or knowingly commit suicide. But these statements do not constitute probative evidence that Stewart's overdose was caused by something other than his "intentionally or knowingly fail[ing] to comply with his doctor's instructions." On the contrary, the "accident" scenario suggested by Dr. Brown actually relies on the notion that patients may *intentionally* take more medicine than was prescribed in order to alleviate pain. This evidence cannot support the jury's verdict in this case.

Ferguson-Stewart's second theory at trial was that Stewart had accidentally taken too many hydrocodone pills because of side effects brought about by the prescribed medication. The evidence supporting this theory consisted of lay testimony as to Stewart's condition prior to his death and expert testimony regarding the side

10

effects of hydrocodone and other medications. Ferguson-Stewart testified as follows

with respect to the days leading to her husband's death:

> The day before or the day of—that he died. They say he actually died early in the morning; so, I guess the day before. He was really disoriented. He was not acting normal or the way he had been acting since he was hurt. He wasn't acting normal at all. His speech was slurred. He was stumbling and falling all over things. I remember—I think I remember one time he actually falling [sic] out of a chair and—in the yard because he was trying to get up and he tripped over a root and he fell on the shoulder he had injured. And that made it even that much more painful for him. He was—he was very—he was crying about it. He really had hurt himself.
>
> . . . .
>
> He was—in the last couple of days before he died, he was getting really bad about forgetting that he had already taken his medicine and taking it again; and you know, sometimes I would have to tell him, "Hey, you already took it. You can't take it again."
>
> And usually he would agree with me; but there were times when he would say, "No. No. No. I didn't take it. I'm sure I didn't take it. I'm still hurting too bad, and I don't remember taking it." So, he'd take it again.
>
> But especially the day of [his death], he was entirely too confused. He wasn't—like I said, he wasn't himself at all.

Briggs also testified that, on the day preceding Stewart's death, he "stumbled a couple

of times" and "d[id]n't look right."

Ferguson-Stewart also presented expert testimony as to whether the side effects

of the medication caused Stewart to overdose. Gary Wimbish, Ph.D., a forensic

toxicologist, agreed with Ferguson-Stewart's counsel that one of the side effects of

drugs such as hydrocodone and carisprodol is "confusion." Dr. Wimbish then stated:

> The sedative effects of [h]ydrocodone and [carisoprodol] both—both produce [e]ffects that—the warnings are don't drive vehicles, operate heavy equipment, or complex tasks while the side effects are appearing. That's when the person first starts taking the medication. They could last several months until they become, if you will, tolerant to those side effects.

11

And they produce confusion, lethargy, sedative [e]ffects, drowsiness, lack of mental acuity, all take place during that time.

Dr. Wimbish also agreed with counsel that these medications can "make you kind of groggy" and that "when a person is groggy, they're more susceptible to maybe not remembering things." Ferguson-Stewart's counsel then proposed a hypothetical:

| | |
|---|---|
| Q. [Ferguson-Stewart's counsel] | Assume with me that Mr. Stewart experienced this syndrome, the Marilyn Monroe syndrome, where he forgot that he took his—that he had already taken his medication, and he accidentally took—just as you described with Marilyn Monroe, woke up, took some later, couldn't remember whether he had taken it, took some, and perhaps one more time within a 24-hour period did the same thing, didn't remember that he had taken it, took some again, so he took more than he was supposed to take because he couldn't remember. |
| | Assume that to be the case. If that was the case, if that is what happened, and assume that Dr. Brown took the sample of blood from—from the central compartment of the body,[8] would it be possible for—for the findings of how much [h]ydrocodone was in Mr. Stewart's body to be consistent with that scenario I just described of forgetting to—whether you had taken your medicine and taken—accidentally taken more than—you should have? |
| A. [Dr. Wimbish] | We wouldn't be able to differentiate that from an overdose. |

---

[8] Dr. Wimbish previously testified that, in order to determine how many pills Stewart ingested from the autopsy findings, "you have to consider . . . if the death occurred during what we call the absorption phase . . . . If the death occurs during this particular phase, the drug has not been completely absorbed," and a "high concentration of that drug will exist in the central compartment, that is[,] in the heart, the lungs, the brain."

Q.                                               Okay. All right. So you absolutely—there's no way, in reasonable scientific probability, that you could say that he—that he had any kind of intentional overdose where he took more pills than he was supposed to in a knowing fashion. There's no way anybody can say that in reasonable scientific probability.

A.                                               That's correct.

Ferguson-Stewart's counsel also asked Dr. Brown whether hydrocodone or the other drugs found in Stewart's body could cause drowsiness:

A. [Dr. Brown]               Probably in some instances, yes.

Q. [Ferguson-Stewart's counsel]   All right. And if someone were to take—to take a medicine late at night—or have you ever been aware of people—patients where they get confused on the dosage on what they [have] taken because of the drowsy effects of medication?

A.                                               Yes, I've—I've heard of that and I think that that has occurred.

Q.                                             Can you explain how that happens, a little bit?

A.                                             They just lose count of, or, you know, they lose inattention, too [sic], you know, not only drowsiness, but older people sometimes will overdose from—they don't know how many pills they took, or don't keep up with them.

Q.                                             Is it, from your general understanding, fair to assume [that if] somebody takes one hydrocodone that might make them drowsy, have a confusing side effect. If they took another one, that they would get progressively more drowsy from an additional dosage [sic]?

13

A.                                    Probably so, because, you know, it's loading it up more.

Dr. Bergeron, the physician who prescribed the hydrocodone, was also asked about the possibility that side effects from the medication caused Stewart's overdose:

Q. [Ferguson-Stewart's counsel]       Although not something I'm sure you would ever predict or want to happen, is it possible or common that someone can forget that they took their last dosage and take more doses?  Have you ever heard of this phenomenon before?

A. [Dr. Bergeron]                     Possibly, yes.

Q.                                    Can you describe that for us?

A.                                    Again, I've just heard of patients who say they couldn't remember if they took their medicine; so, they took another one.

Q.                                    Mr. Stewart who died actually during the night, is it possible that could have happened to Mr. Stewart?

A.                                    It's possible that he took an extra med.

Q.                                    And if someone takes an extra one, then what happens to them?  Do the side effects compound?

A.                                    They could.

Q.                                    How so?  How does that work?

A.                                    Again, just higher doses of the medications are going to give you higher levels of drowsiness.

Q.                                    Which would make it even—could compound or make the drowsiness or the effects of these medications—it could make it even more dangerous or likely that he could make a mistake and

14

> then take too many of a type of medication.

A.    It could.

Q.    Could that be—is that something you would consider a horrible but somewhat naturally flowing result of treatment, that someone could have an accident like this?

A.    An accident like this?

Q.    Well, like—

A.    I mean, I think somebody can take an extra pill now and then.  But to cause, you know, enough to overdose, I don't know about that.

CIIC contends the evidence supporting Ferguson-Stewart's "side effects" theory, including the above-quoted testimony, was insufficient because (1) the theory requires expert testimony to substantiate, and (2) the expert testimony offered by Ferguson-Stewart was based on "possibility, speculation, and surmise."

While we recognize that the expert testimony offered at trial was largely hypothetical and speculative, we conclude that expert testimony was not required to establish Ferguson-Stewart's "side effects" theory.  "[E]xpert testimony is necessary to establish causation as to medical conditions outside the common knowledge and experience of jurors." *Guevara v. Ferrer*, 247 S.W.3d 662, 667 (Tex. 2007).  "[I]n limited circumstances, the existence and nature of certain basic conditions, proof of a logical sequence of events, and temporal proximity between an occurrence and the conditions can be sufficient to support a jury finding of causation without expert evidence." *Id.* at 668 (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995)).  In *Guevara*, the Texas

15

Supreme Court noted that "the causal connection between some events and conditions of a basic nature (and treatment for such conditions) are within a layperson's general experience and common sense." *Id.* For instance, "courts have held that causation as to certain types of pain, bone fractures, and similar basic conditions following an automobile collision can be within the common experience of lay jurors." *Id.* "Thus, non-expert evidence alone is sufficient to support a finding of causation in limited circumstances where both the occurrence and conditions complained of are such that the general experience and common sense of laypersons are sufficient to evaluate the conditions and whether they were probably caused by the occurrence." *Id.* at 669 (citing *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)); *see Jelinek*, 328 S.W.3d at 533 ("When lay testimony is credited as evidence of causation, it usually highlights a connection between two events that is apparent to a casual observer.").

In this case, there was no dispute as to the medical cause of Stewart's death. Each of the experts agreed that he died from ingesting a lethal amount of hydrocodone. The jury was not asked to determine what caused Stewart's death; rather, it was asked to determine what caused Stewart to ingest a lethal amount of hydrocodone. The former question presents an issue of medical causation that must be supported by expert testimony. *See Guevara*, 247 S.W.3d at 667. The latter question, however, is so "basic" that it may be answered merely with reference to "the general experience and common sense of laypersons." *Id.* at 669. It takes no specialized knowledge for a juror to conclude, for example, that a patient exhibiting symptoms of disorientation and memory loss may unwittingly take an excessive amount of prescribed medication.

16

Rather, the "connection" between symptoms of disorientation and memory loss on the one hand, and an overdose on the other, "is apparent to a casual observer." *Id.*

Having found that no expert testimony was required to establish the "side effects" theory of Stewart's overdose, we further conclude that the lay testimony adduced at trial was sufficient to support the jury's verdict. Ferguson-Stewart testified that, on the day before Stewart's death, "[h]is speech was slurred" and "[h]e was stumbling and falling all over things." She testified that, "in the last couple of days before he died, he was getting really bad about forgetting that he had already taken his medicine" and would sometimes "take it again." Considering this testimony in the light most favorable to the verdict, *see City of Keller*, 168 S.W.3d at 822, we find that it constitutes probative circumstantial evidence that Stewart's intentional or knowing failure to comply with doctor's instructions was not the sole cause of his overdose. Moreover, this testimony constitutes more than a mere scintilla of evidence because it gives rise to more than a mere surmise or suspicion that a cause other than intentional failure to comply with doctor's instructions was a proximate cause of Stewart's overdose. *See Jelinek*, 328 S.W.3d at 532 (citing *Kindred*, 650 S.W.2d at 63). Rather, the jury could have reasonably inferred from Ferguson-Stewart's testimony that Stewart's disorientation and apparent memory loss was at least partly the cause of his overdose.[9] Moreover, the

---

[9] It is important to note that the jury was instructed to find that Stewart's death was compensable if his knowing and intentional failure to comply with doctor's instructions was not the *sole* cause of his overdose and death. As noted, even though the instruction does not appear to comply with Division precedent, *see* TWCC Appeal No. 050105-s, 2005 TX Wrk. Comp. LEXIS 50, at *8 (Mar. 8, 2005); TWCC Appeal No. 94257, 1994 TX Wrk. Comp. LEXIS 5675, at *6 (Apr. 18, 1994), CIIC did not object to the instruction. Accordingly, the instruction's inclusion in the jury charge meant that Ferguson-Stewart's burden at trial was merely to produce evidence that *any* occurrence other than Stewart's intentional or knowing failure to comply with doctor's instructions constituted a proximate cause of Stewart's overdose. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge."); *see also Del Lago Partners v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010) ("There may be more than one proximate cause of an event . . . ."). Ferguson-Stewart was not required to show that

jury was not barred from giving weight to this evidence, and the evidence did not conclusively establish the contrary proposition; i.e., that Stewart's overdose was caused solely by his intentional or knowing failure to comply with doctor's instructions. *See City of Keller*, 168 S.W.3d at 810. The evidence was therefore legally sufficient to support the jury's verdict.

We further conclude that the judgment is not so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Cain v. Bain*, 709 S.W.2d at 176. The evidence was therefore factually sufficient to support the jury's implied finding that Stewart's death did not result solely from his intentionally and knowingly failing to comply with his doctor's instructions.

CIIC's issues are overruled.

### III. CONCLUSION

The trial court's judgment is affirmed.

DORI CONTRERAS GARZA
Justice

Delivered and filed the
10th day of May, 2012.

---

Stewart's intentional or knowing failure to comply with doctor's instructions was *not* a cause of his overdose.

18